# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICKY MYERS,<br>        Plaintiff,<br><br>              v.<br><br>AETNA LIFE INSURANCE<br>COMPANY, et al.,<br>          Defendants. | CV 19-9555 DSF (KSx)<br><br>Findings of Fact and Conclusions<br>of Law After Court Trial on<br>Administrative Record |

## I. INTRODUCTION

This is an action for benefits under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq*.  Plaintiff Vicky Myers contends she is entitled to long-term disability benefits under the terms of the long-term disability policy Defendant Aetna Life Insurance Company (Aetna) issued to the California Institute of Technology (Caltech).  A bench trial on the administrative record was held on October 27, 2020.  After consideration of the parties' trial briefs, oral arguments, and the evidence in the Administrative Record,[1] the Court makes the following Findings of Fact and Conclusions of Law.

---

[1] The Court refers to pages from the Administrative Record as "AR __."

## II. FINDINGS OF FACT[2]

### A.    The Long-Term Disability Plan

At all relevant times, Plaintiff Vicky Myers was employed by Jet Propulsion Laboratories (JPL).  Dkt. 32 ¶ 2.  JPL established and maintained a disability insurance plan (LTD Plan) and a life insurance plan for its employees.  <u>Id.</u> ¶ 3.  Both plans were issued by Aetna to Caltech,[3] Policy No. 866280.  <u>Id.</u>

The LTD Plan defines "Total Disability" as follows:

From the date that you first become disabled and until Monthly Benefits are payable for 24 months, you will be deemed to be totally disabled on any day if, as a result of a disease or **injury**, you are unable to perform with reasonable continuity the **substantial and material acts** necessary to pursue your **own occupation** and you are not working in your **own occupation.**

After the first 24 months that any Monthly Benefit is payable during a period of disability, you will be deemed to be totally disabled on any day if, as a result of a disease or **injury**, you are not able to engage with reasonable continuity in any occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, and physical and mental capacity that exists within any of the following locations:

---

[2]  Any finding of fact deemed to be a conclusion of law is incorporated into the conclusions of law.  Any conclusion of law deemed to be a finding of fact is incorporated into the findings of fact.  Where the Court declined to adopt a fact submitted by a party, the Court found the fact was either unsupported, unnecessary, or irrelevant to its determination.

[3] JPL employees were covered by the policies issued to Caltech.  Dkt. 32 ¶ 3 n.1.

- a reasonable distance or travel time from your residence in light of the commuting practices of your community; or
- a distance or travel time equivalent to the distance or travel time you traveled to work before becoming disabled; or
- the regional labor market, if you reside or resided prior to becoming disabled in a metropolitan area.

AR 3198.

The Policy defines "*Own Occupation*" as "[a]ny employment, businesses, trade or profession and the **substantial and material acts** of the occupation you were regularly performing for your employer when your period of disability began.  **Own Occupation** is not necessarily limited to the specific job you performed for your employer." AR 3183.  "*Substantial and material acts*" are defined as "[t]he important tasks, functions and operations generally required by employers from those engaged in your **own occupation** and cannot be reasonably omitted or modified."  Id.

The Life Insurance Plan provides for a waiver of premium if an insured is "permanently and totally disabled."  AR 3053.  It defines "*permanently and totally disabled*" as follows:

You are permanently and totally disabled under this plan on any day if, due to disease or **injury** you are not able to:

- Perform with reasonable continuity all of the **material duties** necessary to pursue you **own occupation** in the usual and customary way; and
- Engage with reasonable continuity in another occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, physical and mental capacity.

Id.

Under the LTD Plan, benefits are limited to 24 months when "it is determined that the disability is, at that time, caused to any extent by a mental condition (including conditions related to alcoholism or drug abuse) described in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders, published by the American Psychiatric Association."  AR 3199.

Myers' monthly benefit of the LTD Plan was 60% of her former salary.  AR 165, 3191.  She has not been paid any benefits under the LTD Policy to date.  Dkt. 32 ¶ 8.

## B.   Myers' Education and Job

Myers was born on March 2, 1959.  AR 535.  She has a high school diploma and attended some college courses.  AR 681, 2949.  Additionally, she attended programs provided by JPL in software-related classes and has certificates in Software Configuration Management II, courses 1-4.  AR 2949.

Myers started working for JPL in 1979.  AR 2949.  She has worked in software for JPL since approximately 1994.  Id.  At the time she stopped working in 2018, her job title was Software Management Engineer and her salary was $130,000.  Id.  In the Work History and Education Questionnaire she completed for Aetna, Myers described her job as: "Be available for immediate customer support for various flight projects[;] [p]rovide OM presentations, recommendations and implementation of CM systems[;] [h]old project meetings, adapt software, track, building and deploy for multiple projects[;] [s]chedule overlapping project requests . . . ."  Id.  She has also reported of her job:

> At JPL, I was responsible for at least six Projects.  On those Projects, I was responsible for the implementation and change management ("CM") support of software procedures and processes, which included CM, code control, software baseline management, release management and change control board administration.  I evaluated, tested and configured the Project's code management tools.  I identified, collected, managed and reported information

4

> throughout the Project's software lifecycle.  I audited
> Release environments at JPL and offsite facilities.  I
> implemented and managed the appropriate level of access
> control to multiple software repositories being updated in
> parallel development.  Additionally, I researched alternate
> methods for software code management and analyzed
> findings and recommended improvements to Project
> management and personnel.

AR 2477.  Myers' job "required [her] to be mentally alert and physically able."  AR 2478.

Both Myers' vocational expert and Aetna determined that her job mostly closely aligns with the U.S. Department of Labor Dictionary of Occupational Titles (DOT) job of Network Control Operator.  AR 086-087, 682, 2661.  The function of a Network Control Operator is to "[m]onitor[] data communications network to ensure that network is available to all system users and resolve[] data communications problems."  AR 086.  "Individuals employed in this position require college level general reasoning, 7th to 8th grade level math skills, and high school grade level language development."  AR 683.  Myers' job was described as sedentary by her employer.  AR 682.

## C.   Myers' Medical Condition

Around April of 2017, Myers began to experience reduced cognitive ability.  AR 658-59, 2478.  It became difficult for her to do her job because she "was more likely to be unable to unravel problems and more prone to making mistakes."  AR 656.  She could tell the quality of her work was falling as it became harder for her to think through problems and remember what she was supposed to be doing.  Id.

Myers' decline was noticed by those around her.  Her co-worker Sheila Chatterjee "noticed a significant difference in [Myers'] ability to focus and to think clearly," which she found to be "alarming and

worrisome." AR 678.  Chatterjee had worked with Myers on and off for twenty years.  Id.  Beginning in April or May of 2017, Myers' husband, William Myers, "began to notice a significant physical decline in her body, most notably extreme fatigue and muscle and joint pain that would build-up during the work week and eventually would require her to rest her body almost the entire weekend." AR 658.  At the time Myers "was supporting numerous different groups for JPL and was frequently working 12-14 hours a day to keep up with the demands each group wanted." Id.

While her health significantly deteriorated around 2017, Myers had initially begun to have issues with fatigue, memory difficulty, and pain around 2003.  AR 586.  At that time, she was diagnosed with fibromyalgia and chronic fatigue syndrome and JPL enabled her to work from home for a period.  AR 015, 661.  She did not completely recover from her symptoms but recovered sufficiently to return to her job.  AR 661, 846.[4]

Due to her health conditions, Myers stopped working on January 5, 2018.  AR 002.

On January 11, 2018, Myers saw her primary care physician, Dr. Dino Clarizio.  AR 2097-2098.  Dr. Clarizio noted Myers' inability to concentrate and believed she could not do her job at all.  AR 2959-2961.

On February 19, 2018, Myers began occupational therapy at Casa Colina Centers for Rehabilitation twice a week to treat her chronic fatigue syndrome.  AR 2063-2064.  She was referred to Casa Colina by Dr. Clarizio for "impaired short term memory, alteration, and mental flexibility impeding ability to return to work." AR 2063.  The Casa Colina intake reported Myers had a relapse of chronic fatigue six weeks prior.  AR 2809.  She had trouble walking and talking, pain throughout

---

[4] Aetna notes Myers' assertions about her condition prior to 2017 have not been verified.  Dkt. 32 ¶ 20.  The Court includes Myers' assertions about the onset of her symptoms in 2003 for context but does not rely on them in its ultimate finding.

her body, and cognitive and physical limitations.  Id.  On March 30, 2018, Myers' therapist, Stephanie Boles, created a treatment plant for six weeks of therapy focused on Myers' diagnosis of cognitive impairment.  AR 2789-2792.  The goals included increased recall, executive functioning, problem solving, and word finding.  AR 2792.  Myers continued to do cognitive and physical therapy with Boles who repeatedly reported she was not ready to return to her previous level of cognitive demand.  AR 2281, 2766.

On June 16, 2017, Myers began seeing psychiatric therapist Megan Lundgren, LMFT.  AR 2047-2048.  During her January 6, 2018 session with Myers, Lundgren noted that Myers complained of stress, anxiety, and possible psychosomatic symptoms, and was "observed to have disorganized thoughts, difficulty focusing, and work-related fearful thoughts."  AR 2740.  During further visits, Lundgren noted Myers had "difficulty focusing on topics that are not based in anxiety." Id.  In an August 28, 2018 letter to Dr. Clarizio, Lundgren summarized her work with Myers, noting she had difficulty concentrating, intense and recurrent lethargy, extreme fatigue, and forgetfulness.  AR 2047.  She also observed Myers "appear[] increasingly fatigued, forgetful, and confused throughout the course of [their] hour-long sessions."  Id.

## D.    Myers' Application for Long-Term Disability Benefits

The LTD Plan has a six-month waiting period.  AR 3191.  JPL called in the claim on May 15, 2018.  AR 002.  Aetna mailed an LTD packet to Myers on May 17, 2018.  AR 010.

On June 5, 2018, Myers filed a long-term disability claim with Aetna.  AR 006.  In the Work History and Education Questionnaire, she listed her job as Software Management Engineer and identified approximately two years of community college and various classes she took through JPL.  AR 2949-2950.

With the claim, Myers submitted an Attending Provider Statement (APS) from Dr. Clarizio dated June 7, 2018.  AR 2959. On the form, Dr. Clarizio listed diagnoses of chronic fatigue, fibromyalgia, and chronic impairment.  Id.  Dr. Clarizio wrote that Myers was

"unable to concentrate." Id.  The report also stated Myers could work zero hours a day[5] and limited her speaking to one hour a day.  AR 2959-2961.

Myers also submitted a Behavioral Health Clinician Statement (BHCS) from Lundgren, dated June 30, 2018.  AR 2736-2738. Lundgren diagnosed Myers with generalized anxiety disorder, dysthymic disorder, and attention deficit disorder.  AR 2736.  She noted Myers' applied focus and concentration in the session was less than five minutes and she was easily distracted.  AR 2737.  Additionally, she stated Myers switched topics frequently and her speech became impaired when she was fatigued at the end of a session.  Id.  She reported Myers was not able to fully return to work without modification because Myers expressed exhaustion when she attended one appointment.  AR 2738.  She also stated Myers could not work part time or volunteer because Myers expressed exhaustion with basic tasks and appeared fatigued and forgetful at the end of the therapy hour.  Id.

Dr. Clarizio's APS form indicated he had referred Myers to a neurologist, Dr. Edward Barton.  AR 2959.  Dr. Barton was consulted for cognitive complaints, myofascial pain syndrome, chronic fatigue, chronic insomnia, and visual aura.  AR 2885.  Barton noted Myers' history of "FMG, chronic fatigue, progressive problems with recall" and that she was "[c]onfusing details, forgetting short term events, conversations."  Id.  He prescribed diagnostic tests, including an

---

[5] Aetna repeatedly asserts that this physical assessment capacity form provided by Dr. Clarizio to Aetna "gave Myers no physical restrictions that would prevent her from performing her job, but limited her speaking to one hour per day due to her alleged inability to concentrate."  Dkt. 30 at 3 (emphasis omitted).  On the form, Dr. Clarizio put a slashed zero next to "Total # of hours patient capable of working per day."  AR 2961.  The Court interprets this as Dr. Clarizio stating that Myers is not capable of working any hours in a day.  Aetna is correct, however, that he does not note any specific physical issues limiting her ability to work, such as an inability to sit or stand.

Electroencephalography test (EEG).  AR 2886.  The EEG was normal.
AR 1429.

Aetna called Myers on June 22, 2018 regarding her claim.  AR
013-014.  She relayed that she was being treated by the following
doctors: Dr. Clarizio, Dr. Barton, Dr. Christopher Cheng (sleep
specialist), Dr. Sean Tsai (alternative medicine), Dr. Christakis
Christodolou (cardiologist), Dr. Daniel Arkfeld (rheumatologist), Casa
Colina, and Lundgren.  AR 14-15.  She reported occasional pain but
emphasized her main problem was with cognition.  Id.  Myers reported
she had been diagnosed with chronic fatigue and fibromyalgia but was
able to work with the conditions until 2017.  Id.  Now, on a "good
thinking day," she could go outside and pull weeds for 20 minutes, do a
load of laundry, and try to read or do brain puzzles as part of her
cognitive therapy.  Id.  The Aetna claim representative noted Myers
was "very clear in reporting multiple times about cognition problems
being the most troubling."  Id.

Aetna collected records from Dr. Tsai, who had performed
osteopathic manipulative treatment and used myofascial release and
other techniques to treat Myers' fibromyalgia and other somatic
dysfunctions beginning on January 13, 2018.  AR 2716-2717.  He noted
"[i]ncreased tissue tension, altered tissue texture, decreased motion,
tenderness and/or asymmetry" in certain regions.  AR 2716.  At an
appointment in March 2018, Dr. Tsai noted: "Patient continues to
[complain of] having generalized body pains that are dull and constant.
Fatigue is slightly better.  Body pains worsened after the last PT
session.  Fatigue continues to be worse with increased activity.
Nothing makes the fatigue better."  AR 2706.

Myers called Aetna on July 25, 2018 to advise that she had
recently seen a new rheumatologist, Dr. Arkfeld, and that she would be
having a brain MRI and some cardiac testing.  AR 272.  Myers reported
she had been "struggling with severe fatigue, difficulty with
concentration/focus and increased pain mostly from her hips down to
her legs and knees."  Id.

9

Dr. Arkfeld began treating Myers' fibromyalgia symptoms.  AR 2482.  Because of her increasing cognitive symptoms, on July 18, 2018, Dr. Arkfeld referred Myers for an MRI of the brain, which she underwent on August 8, 2018.  AR 2506.  Dr. Arkfeld charted that Myers' MRI had revealed several lesions – "scattered nonspecific T2 hyperintensities . . . in the subcortical white matter of the frontal lobes bilaterally."  AR 2622-2623.  As a result, Dr. Arkfeld referred Myers for a variety of follow-up appointments, including one with Dr. Shijun Xi, who specializes in the treatment of allergic and immunologic conditions.  AR 2507.

Dr. Xi evaluated Myers on August 21, 2018 and found she exhibited "many features suggestive of mast cell activation syndrome" and referred her for diagnostic testing.  AR 3015.  Shortly after, Dr. Xi informed Myers the results of her "histamine level test [were] very elevated, which [was] very suggestive of mast cell activation syndrome" (MCAS).  Id.  MCAS can cause a wide range of symptoms, which are often debilitating, and can impact any and all systems within the body, frequently affecting several systems at the same time.  Id.  MCAS symptoms include cognitive dysfunction, chronic fatigue, and pain.  Id.

## E.   Aetna's Claim Review

Aetna received and reviewed the following: medical notes from Dr. Soon-Min Tan, a rheumatologist; medical notes from Dr. Barton; medical notes from Dr. George Thomas, a gastroenterologist; Clarizio's APS; and a letter and the BHCS from Lundgren.  AR 42-46.

Aetna conducted two reviews on July 5, 2018 – a behavioral health review and a clinical review.  AR 127, 362.

Aetna's behavioral health clinician called Myers on July 5, 2018 to evaluate her claim from a behavioral health standpoint.  AR 50-56. Myers reported being out of work due to fibromyalgia, chronic pain, and other issues stemming from these conditions.  AR 55.  The clinician noted Myers had no immediately apparent functional impairments on the call.  AR 49.  Based on the review of the medical records and the

10

discussion with Myers, the behavioral health clinician determined there was no support for mental health impairment.  AR 55.

Aetna's nurse clinician also reviewed the records and determined there was no clinical support for a physical impairment.  AR 362.  She noted all the physical exams were "non-focal" and the labs were "not indicative of any quantifiable diagnoses."  AR 127.  Additionally, she found there was "no demonstration of any organic cognitive loss or physical functional loss due to any reported symptoms or diagnoses."  Id.

After these reviews, Myers submitted additional information, including notes from Dr. Cheng, Dr. Barton, Dr. Arkfeld, and an endocrinologist.  AR 129-131.  Aetna's nurse clinician reviewed this information on September 4, 2018 but did not alter her evaluation.  AR 128-133, 269.  She noted that, as to Myers' complaints of cognitive issues, Myers had not provided "any neuropsychological evaluations showing any deficits found on extensive testing with validity measures included."  AR 269.

Based on its internal review of the medical records, Aetna found that Myers was not disabled and notified her of the claim denial by call and a letter dated September 28, 2018.  AR 267, 361-364.

Myers called Aetna on October 1, 2018 to ask if her claim could be reopened with a neuropsychology report she had recently obtained.  AR 267.  Aetna's claim manager told her that she could appeal the decision and the appeal instructions were included with the denial letter.  Id.

F.    **Myers' Appeal**

Myers notified Aetna on November 8, 2018 that she would be pursuing her appeal through counsel and requested her file.  AR 173.

Myers appealed Aetna's decision on April 26, 2019 through her attorneys.  AR 2504.  In the appeal letter, Myers asserted that she was physically and cognitively disabled from her occupation for reasons other than a mental condition.  AR 2509.

Following the initial appeal submission, Myers' counsel called Aetna to advise that they would be submitting additional documents for appeal.  AR 373.  Aetna agreed to wait for these additional documents before starting its appeal review.  Id.  Myers subsequently submitted two appeal supplements that contained additional medical records and letters from her treaters.  AR 613, 634.

As part of her appeal, Myers submitted additional medical records, a neuropsychology report from Dr. Heleya Rad, a vocational assessment from Theresa Kopitzke, letters from treating physicians, medical journal articles explaining MCAS and fibromyalgia, and personal statements from herself, family, and friends.  AR 2504-2517.

The report from Dr. Rad, Ph.D., reflected that she saw Myers on September 20, 2018 for a comprehensive neuropsychological evaluation.  AR 660-671.  The evaluation included a variety of tests that measured such areas as attention, problem solving, memory, language, I.Q., visual-spatial skills, academic skills, and social-emotional functioning.  Id.  Rad noted in taking the tests, Myers "appeared to be trying hard to focus" but "became confused on an executive measure that required mental flexibility, and had difficulty shifting between sets."  Id.  In interpreting Myers' Minnesota Multiphasic Personality Inventory-2 profile, Rad found "[s]he lacks the energy to cope with everyday problems and has difficulty with memory and concentration."  AR 668.  And, in interpreting Myers' Behavioral Rating Inventory of Executive Function profile, Rad found "Myers is experiencing difficulty with behavioral and/or cognitive flexibility," including "difficulty beginning, starting, or 'getting going' on tasks, activities and problem-solving approaches."  Id.  Additionally, she found "Myers experiences substantial difficulty holding an appropriate amount of information in mind or in 'active memory' for further processing, encoding, and/or mental manipulation."  Id.  Rad noted that Myers' difficulty sustaining

12

working memory had a negative impact on her "ability to remain attentive and focused for appropriate lengths of time." Id.  Overall, Rad found that Myers' "profile reflects moderate decline in domains of visual memory and aspects of executive functioning," and that her "cognitive difficulties interfere with her capacity for independence in daily life."  AR 670.

Myers also submitted an April 12, 2019 vocational report from Kopitzke.  AR 680-686.  The report identified the DOT occupation "Network Control Operator" as the job most closely aligned with Myers' job.  AR 682.  Based on a phone interview with Myers and a review of medical records, Kopitzke concluded Myers was unable to perform her occupation.  AR 683-685.

Kopitzke noted Myers' difficulties during their phone interview. AR 681.  Kopitzke stated that Myers "spoke slowly and tangentially," "required frequent redirection throughout the call and was at times very difficult to follow," "had marked difficulty describing her medical and vocational history in an organized manner," "demonstrated notable problems with her ability to recall information," including doctors' names and specific dates, and frequently "los[t] her train of thought, stopping in mid-sentence."  Id.  Twenty minutes into the call, Myers asked with whom she was speaking and what the class was regarding. Id.  Koptizke noted Myers' "cognitive abilities seemed to decline as the call progressed, as noted by her tendency to digress."  Id.

Dr. Clarizio wrote a letter, dated March 1, 2019, stating Myers "is unable to work in any capacity" due to her multiple medical conditions "including Fibromyalgia, Hypothyroidism, Mass Cell Activation Syndrome, Obstructive Sleep Apnea and White Matter Abnormality on MRI of the Brain."  AR 675.

Two letters from Dr. Xi – dated October 5, 2018 and May 6, 2019 – noted that Myers' "[c]onstellation of symptoms combined with positive histamine level is consistent with diagnosis of mast cell activation syndrome, which can cause significant pain and cognitive dysfunction, as well as other symptoms."  AR 672-673, 2451.

A letter from Dr. Arkfeld dated April 13, 2019 advised that in his "medical opinion as a board certified physician in internal medicine and rheumatology, Vicky Myers is completely unable to work in her position as a software configuration manager" due to her "numerous medical problems, the most problematic for her being neurocognitive impairment with decreased functionality." AR 2457-2458. He noted "[i]n the approximately 1 year that [he] ha[s] seen her, she has not shown any characteristics that would allow her to function due to pain and fatigue," with the main issue being "her difficulty thinking and accomplishing tasks." AR 2458.

A clinic note from hematologist Dr. Ilene Weltz dated April 23, 2019 assessed that Myers had mast cell activation syndrome. AR 2459-2461.

Aetna sent Myers' file to three third-party vendors for peer review: Dr. Gary Nudell (internal medicine), Dr. Elizabeth Gay (neuropsychology), and Dr. Eric Kerstman (aerospace medicine, physical medicine and rehabilitation pain medicine). AR 216, 233, 249.

Dr. Nudell prepared a written report dated June 19, 2019. AR 600-612. Dr. Nudell reviewed Myers' diagnoses of hypothyroidism, chronic sinusitis, esophageal spasms, coronary artery spasms, chronic urticaria, white matter abnormality of the brain, fibromyalgia, nausea, and MCAS. AR 606. Dr. Nudell did not discuss cognitive impairment or dysfunction because he deferred to the neuropsychological reviewer on those matters. AR 608. After a review of the records, Dr. Nudell found that, from an internal medicine perspective, the medical records did not support functional impairment based on any of the documented medical conditions because "the medical records do not specifically document observable physical examination or diagnostic testing to support impairment." AR 608-611.

Dr. Gay prepared a written report, also dated June 19, 2019. AR 577-599. After reviewing Myers' records, Dr. Gay found Myers' reported cognitive fatigue, cognitive impairment, attention deficit hyperactivity disorder, dysthymic disorder, emotional distress, and

memory difficulties were not preventing her from performing her activities of daily living.  AR 593.  In making her findings, Dr. Gay emphasized the medical records were inconsistent because some of Myers' doctors had noted she appeared to function normally during visits, and Myers' testing scores showed a considerable range and variability.  AR 593-594.  Based on this, Dr. Gay found there was not "consistent, cohesive, and/or confident findings of impaired cognitive function and/or severe emotional dysregulation or behavioral dysfunction."  AR 594.

Finally, Dr. Kerstman prepared a written report dated September 23, 2019.  AR 539-549.  Dr. Kerstman determined from a physical medicine and rehabilitation and pain medicine standpoint, the medical documentation did not support a disabling diagnosis.  AR 547.  Like Dr. Nudell, Dr. Kerstmann did not consider Myers' cognitive status as it is outside his area of expertise.  Id.  Dr. Kerstman noted there were not significant abnormalities on physical examination or diagnostic testing to support that Myers would be precluded from sustained full-time activities.  AR 547-548.

Aetna provided these peer review reports to Myers' counsel for their review and response.  AR 377, 434.  In response, Myers' counsel submitted responses from Dr. Rad, Dr. Arkfeld, and Dr. Clarizio; an additional declaration from Myers; a fibromyalgia article; and additional medical records.  AR 487-490, 2466-2501.

In Dr. Rad's response to Dr. Gay's report, she disagreed with Dr. Gay's determination because she believed Dr. Gay's report did not accurately reflect Myers' neuropsychological profile.  AR 2466-2469.  Rad noted that objective findings of Myers' neuropsychological examination revealed weaknesses in visual-spatial organization, working memory, visual memory, delayed memory for simple visual information, immediate and delayed memory for a complex design, response inhibition/set-shifting, and significant emotional distress.  AR 2467-2468.  In particular, Rad noted Myers' recall of visual material fell in the 2nd and 3rd percentile, which was indicative of a retrieval deficit

for visual information that would impact her independence and effectiveness at work.  AR 2468.

Dr. Arkfeld submitted a response to Dr. Nudell's report.  AR 2480-2481.  Dr. Arkfeld disagreed with Dr. Nudell and stated that Myers was impaired and could not work, and that fibromyalgia could result in functional impairment.

Dr. Clarizio submitted a response to Dr. Kerstman's report.  AR 488-490.  He disagreed with Dr. Kerstman's key findings that Myers did not have a disabling diagnosis, was not functionally impaired from her diagnosis, and did not suffer any significant abnormalities that support functional impairment.  AR 488.  Dr. Clarizio noted that he found Myers' reports of pain credible and that there is a basis for functional impairment for one suffering from fibromyalgia.  AR 489.

Myers also submitted a 2016 editorial from the medical journal *Clinical and Experimental Rheumatology* titled "Fibro-fog."  AR 2471-2473.  The article discussed the "wide range of cognitive difficulties such as forgetfulness, memory lapses, mental confusion, reduced verbal fluency and diminished ability to concentrate" that patients with fibromyalgia commonly complain of.  AR 2471.  According to the article, "the most consistent cognitive deficits in [fibromyalgia] have been found in working memory, attention, and executive function, particularly in the presence of distractors or competing stimuli." Id.

These additional records and responses were given to Dr. Gay and Dr. Nudell for their review and response.  Both doctors provided addendums to their reports stating the new records did not change their prior conclusions.  AR 550-558.

By a letter dated October 29, 2019, Aetna notified Myers that its decision would be upheld on appeal.  AR 482-484.

## III. STANDARD OF REVIEW

The court reviews challenges to an ERISA plan's denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or

to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  When review is de novo, "the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." Muniz v. Amec Constr. Mgmt. Inc., 623 F.3d 1290, 1295-96 (9th Cir. 2010); see Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006) (en banc) (when a court reviews the denial of benefits de novo, the court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits").

A claimant challenging a plan administrator's decision bears the burden of proving entitlement to benefits by a preponderance of the evidence.  See Shaw v. Life Ins. Co. of N. Am., 144 F. Supp. 3d 1114, 1123 (C.D. Cal. 2015) (citing Muniz, 623 F.3d at 1294).  In a trial on the record, the court "can evaluate the persuasiveness of conflicting testimony and decide which is more likely true." Kearney v. Standard Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999); see Schramm v. CAN Fin. Corp. Insured Grp. Benefits Program, 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010) (noting that, in reviewing the administrative record, "the Court evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate").

## IV. CONCLUSIONS OF LAW

The parties agree the proper standard of review here is de novo. In performing a de novo review, the Court is not required to accept the conclusion of any particular treatment provider or medical file review. For instance, the Court does not accord special deference to the opinions of treating physicians based on their status as treating physicians.  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  Instead, opinions must "be accorded whatever weight they merit." Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) (citing Black & Decker, 538 U.S. at 834).  However, a court may give greater weight to a treating physician's opinion where it is evident a particular physician has had a "greater opportunity to know and observe the patient than a

17

physician retained by the plan administrator" who conducts a file review.  Id. (internal quotation marks omitted).

Here, because the relevant provisions focus on the employee's ability to perform the acts necessary to carry out her usual occupation, whether Myers is "disabled" must be measured by her functional capacity as compared to the duties of her usual occupation.  Under such a functional test, the Ninth Circuit has explained: "The mere existence of an impairment is insufficient proof of disability.  A claimant bears the burden of proving that an impairment is disabling." Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) (citations and internal quotation marks omitted).

Therefore, reasoned assessments of what Myers can and cannot do are given greater weight than mere statements of medical diagnoses.  See, e.g., Shaw v. Life Ins. Co., 144 F. Supp. 3d 1114, 1129 (C.D. Cal. 2015); Holifield v. UNUM Life Ins. Co. of Am., 640 F. Supp. 2d 1224, 1237-38 (C.D. Cal. 2009).  Descriptions of symptomology are likewise more helpful in determining Myers' functional capacity than are mere diagnoses.  See Muniz, 623 F.3d at 1296 (recognizing the relevant issue before the district court on de novo review was whether the evidence could confirm the plaintiff's "symptoms rose to the level of total disability" such that she was "unable to perform" essential job duties (internal quotation marks omitted)).

## A.    Myers' Occupation

Myers' occupation is a sedentary one that requires continuous cognitive engagement.  Aetna argues Myers can perform her job because a "Network Control Operator's job requirements . . . are not difficult."  Dkt. 30 at 12.  Rather than rely on Myers' actual job duties, it recites the tasks for a DOT Network Control Operator which include "[e]xplain user procedures necessary to transmit data," "[m]onitor modems and display screen of terminal to mainframe computer to detect error messages that signal malfunction in communications software or hardware," and "[r]ead technical reference manuals for

communications hardware and software to learn cause of problem." Id. at 13.

If Myers' medical condition is what she claims, it is clear she cannot perform even these "not difficult" tasks for more than short spurts. Aetna does not dispute this, but argues "Aetna's position has always been that there is nothing about Myers' neuropsychological test scores that indicate that she has any impairment which renders her unable to perform the occupational duties listed above." Id. This is not an argument about Myers' *occupational abilities* but rather about her *medical condition*. In other words, Aetna is not saying that Myers has a mild impairment that still lets her perform her own occupation; Aetna argues Myers has no such impairment. The Court therefore concludes that if it determines Myers' medical condition has rendered her substantively cognitively impaired, she cannot perform her occupation.

## B.     Myers' Medical Condition

Prior to the onset of her medical difficulties, Myers worked full time at JPL for decades. AR 2949. Her husband testified that she regularly worked 12- or 14-hour days. AR 658. Myers' abilities completely transformed with the decline in her various medical conditions. She could no longer work because basic activities resulted in extreme fatigue. Her cognitive skills were compromised such that she had a hard time focusing and trouble remembering. In the letter she submitted with her appeal, Myers stated it takes her two to three hours to get ready each day, she cannot drive more than a few miles and sometimes has to stop in parking lots to rest, she is unable to be up for more than an hour or two a day, she cannot read more than a few emails before everything is blurry, she loses items easily, she frequently loses her train of thought, and she has trouble recalling basic details such as a neighbor's name. AR 655-657.

Myers has been diagnosed with mast cell activation syndrome, fibromyalgia, cognitive fatigue, and cognitive impairment. AR 582. For these and other conditions she has, she has been treated by a variety of

methods including occupational therapy, physical therapy, psychotherapy, medications, and trigger point injections.  AR 545. None of these treatments has been particularly successful.

Aetna's arguments in support of its decision to deny benefits focus largely on the lack of objective evidence such as tests to show her disability.  According to Aetna, Myers' diagnoses coupled with her self-reports to medical providers are insufficient.  Dkt. 25 at 17.  However, Myers' diagnosed conditions of chronic fatigue, fibromyalgia, and MCAS are all difficult to measure objectively through tests or other evaluations.  "In the context of a condition, such as plaintiff's, characterized by disabling pain and fatigue, a physician invariably relies on a patient's descriptions of his or her condition and other types of subjective information in making a diagnosis and in assessing a patient's limitations."  Tam v. First Unum Life Ins. Co., No. CV195227FMOJEMX, 2020 WL 5904804, at *9 (C.D. Cal. Sept. 30, 2020) (citing Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 678 (9th Cir. 2011)); see also Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 872 (9th Cir. 2004) ("[F]ibromyalgia's cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective.  There are no laboratory tests for the presence or severity of fibromyalgia."), overruled on other grounds as recognized by Salomaa, 642 F.3d 666.

In Salomaa, the Ninth Circuit discussed the issues surrounding disability benefits for individuals with chronic fatigue syndrome and fibromyalgia:

> One can understand the frustration of disability plan administrators with claims based on such diseases as chronic fatigue syndrome and fibromyalgia.  Absence of objective proof through x-rays or blood tests of the existence or nonexistence of the disease creates a risk of false claims. Claimants have an incentive to claim symptoms of a disease they do not have in order to obtain undeserved disability benefits.  But the claimants are not the only ones

20

> with an incentive to cheat.  The plan with a conflict of
> interests also has a financial incentive to cheat.  Failing to
> pay out money owed based on a false statement of reasons
> for denying is cheating, every bit as much as making false
> claim.  The plan has no exception to coverage for chronic
> fatigue syndrome, so [the plan administrator] has taken on
> the risk of false claims for this difficult to diagnose
> condition.  Many medical conditions depend for their
> diagnosis on patient reports of pain or other symptoms, and
> some cannot be objectively established until autopsy.  In
> neither case can a disability insurer condition coverage on
> proof by objective indicators such as blood tests where the
> condition is recognized yet no such proof is possible.

642 F.3d at 678; see also Holmstrom v. Metro. Life Ins. Co., 615 F.3d
758, 769 (7th Cir. 2010) (noting that for conditions such as
fibromyalgia, the court has "rejected as arbitrary an administrator's
requirement that a claimant prove her condition with objective data
where no definitive objective test exists for the condition or its
severity").

    Viewing the record in its totality, the Court finds Myers has met
her burden of proving entitlement to benefits under the LTD Plan.
Aetna erred in relying on the opinion of three doctors who did not
examine Myers over the opinions of numerous doctors who did.  While
an ERISA plan administrator need not provide in-person medical
evaluations of its claimants, the Court finds Drs. Clarizio's, Arkfeld's,
Rad's and Xi's – as well as other doctors' and therapists' – in-person
evaluations and observations are more persuasive than the paper
review conducted by Aetna's three peer reviewers.  See Salomaa, 642
F.3d at 676 (finding medical opinions rendered following in-person
examination more persuasive than contrary opinions from an
administrator's paper-only review); Bunger v. Unum Life Ins. Co. of
Am., 299 F. Supp. 3d 1145, 1160 (W.D. Wash. 2018) (noting that the
plaintiff's "claim also finds support in the evidence from every doctor
who personally examined him"); Nagy v. Grp. Long Term Disability
Plan for Emps. of Oracle Am., Inc., 183 F.Supp.3d 1015, 1031 (N.D. Cal.

2016) ("As an initial matter, none of [the insurer's] four medical examiners personally examined [plaintiff]; instead, each of the examiners based his or her conclusions upon a review of [plaintiff's] medical records . . . . Accordingly, their reports lack the level of credibility normally attributed to physicians who have personally observed a patient."); Oldoerp v. Wells Fargo & Co. Long Term Disability Plan, 12 F. Supp. 3d 1237, 1254 (N.D. Cal. 2014) ("While an ERISA plan administrator need not provide in-person medical evaluations of its claimants, Simonelic's in-person observations are more persuasive than Goldman's paper review."). Myers consulted numerous doctors across specialties and disciplines, and all found her unable to work due to her medical condition. In short, the Court is persuaded that, under the circumstances here, the reports by Myers' treating physicians and therapists are valid and credible measures – not only of Myers' medical condition but also of her ability to work.

The Court does not find the reports of Aetna's three reviewing doctors[6] particularly persuasive for a variety of additional reasons. First, Aetna's reviewing doctors reached many of their conclusions based on the supposed discrepancies and inconsistencies in the reports made by Myers' treating physicians. For instance, Dr. Gay's report states the "clinical inconsistencies found in the medical records, across multiple disciplines, specializations and providers would argue against support for consistent and/or severely impaired function." AR 593. In addition to finding any discrepancies between Myers' treating physicians' reports negligible,[7] the Court notes such inconsistencies do

[6] The Court evaluates the three physician reports generated on appeal rather than the two clinical evaluations conducted by Aetna in denying the claim in the first instance because it finds the reports more credible. By contrast, Aetna's nurse clinician's reliance on labs not being indicative of "any quantifiable diagnosis" and the lack of "demonstration of any organic cognitive loss," AR 059-060, is inappropriate given the nature of Myers' conditions, as discussed above.

[7] Dr. Gay relies on doctors' reports that note that Myers presented with normal speech, appropriate cognitive function, and no impairment of concentration. AR 593-594. The Court does not find these reports preclude a

not automatically negate any medical condition.  If Dr. Gay wished to more persuasively articulate why such inconsistencies demonstrated Myers did not have functional impairment, she should have explained why the more positive health findings were more trustworthy than the more negative ones.

To the extent Aetna relies on inconsistencies to show Myers is not a reliable narrator – and imply she may be making a false claim – they have not sufficiently established her unreliability.  Myers' treating physicians, whom she interacted with in person multiple times, found her credible.  Additionally, some inconsistencies are congruent with the variability of her condition and the mental fog it created.  The Court therefore finds her credible.[8]

Second, only one of Aetna's three reviewing doctors, Dr. Gay, actually considered Myers' cognitive issues – the problem she repeatedly emphasized was the main issue with her ability to work. See AR 547 (Dr. Kerstman noting Myers' "cognitive status will be deferred as it is outside the area of my expertise"), 608 (Dr. Nudell noting he "will defer any discussion regarding cognitive impairment/dysfunction to the neuropsychological reviewer").

---

finding of disability because by Myers' own account her condition varies, and various doctors have noted that Myers is able to function normally for limited amounts of time.

[8] Aetna also argues that Myers is being deceptive by attempting to avoid the policy's 24-month limitation on benefits for psychiatric disabilities by claiming this is a physical rather than mental condition.  Dkt. 30 at 8, 20. The LTD Plan defines mental disorders as those listed in the Diagnostic and Statistical Manual of Mental Disorders (DSM-5).  AR 3199.  The DSM-5 does not include chronic fatigue syndrome, fibromyalgia, or MCAS.  DSM-5 Table of Contents, American Psychiatric Association (2013), https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/DSM/APA_DSM-5-Contents.pdf.  Yet, all have cognitive effects.  Therefore, Myers' initially emphasizing her mental cognition as the "main" problem, dkt. 30 at 20, is not inconsistent with her seeking disability for a physical rather than psychiatric condition.

Therefore, of the three reports, only Dr. Gay's speaks to whether Myers' cognitive issues render her unable to work.

Third, Dr. Nudell unfairly discounted the effect fibromyalgia can have on individuals.  Dr. Nudell's report states "[w]hile [fibromyalgia] may result in subjective myofascial discomfort, there is overall no basis for restrictions with activities of daily living or any other functional impairment as a result of this myofascial pain syndrome."  AR 609.  Additionally, he notes "there is no basis for physical/medical impairment" despite the fact that "subjective complaints of fatigue are not uncommon with the diagnosis of fibromyalgia[ and] MCAS."  Id.  Dr. Nudell seems to state fibromyalgia cannot render one disabled, which does not make sense – at least not in a legal context.  As explained above, the Ninth Circuit has repeatedly found that fibromyalgia is an impairment that can render one disabled.  See Revels v. Berryhill, 874 F.3d 648, 656-57, 662 (9th Cir. 2017) (finding the failure to construe the medical evidence "in light of fibromyalgia's unique symptoms and diagnostic methods" was error); Salomaa, 642 F.3d at 678 (discussing fibromyalgia in the disability plan context); see also Kennedy v. Lilly Extended Disability Plan, 856 F.3d 1136, 1137 (7th Cir. 2017) ("There used to be considerable skepticism that fibromyalgia was a real disease.  No more.").

On balance, the evidence weighs in Myers' favor, and she meets her burden of establishing her entitlement to disability benefits.  A preponderance of the evidence shows Myers' fibromyalgia, MCAS, and chronic fatigue syndrome preclude her from performing at the level of mental functioning required for her job.

## V. CONCLUSION

For the reasons stated above, the Court finds in favor of Myers.  Myers is to submit a proposed judgment no later than January 5, 2021.  Aetna may submit objections to the proposed judgment no later than January 18, 2021.  Counsel are to meet and confer and attempt to resolve the issue of attorneys' fees and costs no later than January 12,

2021.  If no resolution is reached, Myers' motion for attorneys' fees must be filed no later than February 16, 2021.

      IT IS SO ORDERED.

DATED:  December 17, 2020

_____
Honorable Dale S. Fischer
UNITED STATES DISTRICT JUDGE